UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                        :

ENRICO FRIGERIO,          :
                        :

              Plaintiff,   :

                        :

      - against -      :

                        :

UNITED STATES OF AMERICA,   :

                        :

            Defendant.  :
------------------------------------------------------- X
SHIRA A. SCHEINDLIN, U.S.D.J.:

**OPINION AND ORDER**

**10 Civ. 9086 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/22/11

## I.    INTRODUCTION

        Enrico Frigerio brings this suit against the United States of America

under the Federal Tort Claims Act ("FTCA"),[1] alleging misconduct by the Federal

Bureau of Investigation ("FBI"), the United States Attorney's Office, and the

Bureau of Prisons ("BOP") stemming from his September 2007 arrest and

subsequent incarceration and prosecution.  The United States moves to dismiss all

causes of action for failure to state a claim, or in the alternative, certain causes of

action for lack of subject matter jurisdiction.  For the reasons discussed below, the

defendant's motion is granted.

## II.    BACKGROUND

---

[1]    28 U.S.C. § 1346.  *See also* 26 U.S.C. §§ 2671-2680.

A.     **Facts Alleged in the Amended Complaint**

In 1987, a Grand Jury in this district indicted Enrico Frigerio on four counts arising out of an alleged drug conspiracy and extortion scheme.[2]  Those crimes had allegedly been committed between January 1 and October 25, 1984.[3]  Although Frigerio was in custody for a short time in December 1984,[4] by the time the Indictment was returned, Frigerio was back in his native Switzerland.[5]  Frigerio avers that he was never told of the charges against him, though a Drug Enforcement Agency ("DEA") agent, Robert Stia, visited Frigerio's home in Lugano, Switzerland in the mid-1990s.[6]  The plaintiff asserts that the Government neither sought extradition nor commenced prosecution at any point during this period.[7]

On September 3, 2007, Frigerio, accompanied by a documentary film crew (for reasons never made clear in the Amended Complaint), flew from

---

[2]     *See* Amended Complaint ("Am. Compl.") ¶ 7.

[3]     *See id.*

[4]     *See id.* ¶ 24.

[5]     *See id.* ¶ 8.  Because the Indictment was not returned until 1987, Frigerio was free to return to Switzerland.

[6]     *See id.* ¶¶ 8-10.

[7]     *See id.* ¶ 11.

Switzerland to New York's John F. Kennedy Airport.[8]  Pursuant to an outstanding warrant,[9] FBI Special Agents Cindy Coppola and Eric Reese arrested Frigerio at the airport and transported him to the Metropolitan Detention Center ("MDC").[10] According to Frigerio, Coppola and Reese knew at the time of the arrest that the Government lacked probable cause to make the arrest, retained insufficient evidence to seek a prosecution, and was barred by the Speedy Trial Act from even initiating proceedings.[11]

The Government unsealed Frigerio's 1987 Indictment two days later on September 5, 2007.[12]  One week after that, Frigerio appeared before this Court, at which time the Government explained that Frigerio's case was related to the 1980s "Pizza Connection" case and that the Government would immediately begin producing discovery.[13]  At that time, the Government did not disclose that it lacked evidence to maintain a prosecution.[14]

---

[8]     *See id.* ¶ 12.

[9]     *See* Transcript of 09/12/07 Hearing.

[10]     *See* Am. Compl. ¶ 13.

[11]     *See id.* ¶ 14; *see also* 18 U.S.C. § 3161.

[12]     *See* Am. Compl. ¶ 15.

[13]     *See id*.

[14]     *See id.* ¶¶ 16-18.

Following his arrest, Frigerio was incarcerated at the MDC.[15]  While there, Frigerio witnessed a "jailhouse riot," as well as "other acts of violence."[16] He experienced "severe emotional distress" as a result and "was concerned that he would not make it out of prison alive."[17]  Those experiences form the basis for certain of Frigerio's claims.

From the first hearing before the Court, Frigerio stated that he intended to offer an entrapment defense.[18]  Frigerio planned to use as his evidence the audio and video tapes that the Government claimed to have made during meetings between undercover agents, cooperating witnesses, and Frigerio.[19]  The Government, meanwhile, insisted that those tapes would prove its case.[20] However, Frigerio pleads that the Government knew or should have known that the tapes no longer existed and that there was no other physical evidence.[21]  Further, Frigerio avers that agents Coppola and Reese learned on or around October 1, 2007

---

[15]     *See id.* ¶ 20.

[16]     *Id*.

[17]     *Id.* ¶¶ 20-21.

[18]     *See id.* ¶ 29.

[19]     *See id*.

[20]     *See id.* ¶ 30.

[21]     *See id.*

-4-

that "the evidence" — presumably meaning the tapes — "had been destroyed in 1999."[22]  Frigerio asserts that if probable cause had ever existed, it ceased to do so on that date.[23]

Frigerio further alleges that Coppola continued to assert that the tapes existed, despite having learned that they did not.[24]  The Amended Complaint avers that

> on October 26, 2007, Coppola met with Frigerio and his attorneys and gave descriptions of vivid and detailed 'evidence' that she claimed was on audio and videotape and, time and time again, informed Mr. Frigerio that the jury would convict based upon the evidence on those tapes.[25]

Coppola urged Frigerio to accept a plea agreement, but he declined.[26]

It was not until November 6, 2007, that the Government informed Frigerio and the Court that "no evidence existed upon which to support a prosecution."[27]  Shortly thereafter, in a November 15, 2007 hearing on Frigerio's two motions to dismiss the Indictment, Coppola acknowledged "as of at least

---

[22]   *Id.* ¶ 31.

[23]   *See id.* ¶ 32.

[24]   *See id.* ¶ 33.

[25]   *Id.*

[26]   *See id.* ¶¶ 33-34.

[27]   *Id.* ¶ 41.

October 1, 2007 . . . the supposed evidence against Mr. Frigerio did not exist."[28]

Less than a week later, on November 21, 2007, the Government submitted to the court *nolle prosequi* papers, concluding that "further prosecution . . . would not be in the interests of justice."[29]  Later that day, Frigerio was released directly from the courthouse.[30]  Though Frigerio entered the country with $2,000 and a cell phone, as well as proper identification,[31] he was released wearing only a t-shirt and prison slippers, and without any money.[32]  Soon thereafter, Frigerio's attorneys telephoned the Court to determine whether the *nolle prosequi* order had been submitted and learned that their client had been released.[33]  Frigerio's lawyers then "raced to the courthouse and found Mr. Frigerio huddled outside in a corner of the stairs of the courthouse trying to stay warm."[34]  Frigerio has since returned to

---

[28]    *Id.* ¶ 44.

[29]    *Id.* ¶ 47; *Nolle Prosequi* Order ("*nolle prosequi* order"), Ex. F to Declaration of John D. Clopper, Assistant United States Attorney, in Support of Motion to Dismiss ("Clopper Decl.").

[30]    *See* Am. Compl. ¶ 49.

[31]    *See id.* ¶ 51.

[32]    *See id.* ¶ 49.

[33]    *See id.* ¶ 52.

[34]    *Id.* ¶ 53.  However, the Court takes judicial notice of the fact that on Wednesday, November 21, 2007, the temperature did not fall below 51 degrees Fahrenheit after 10 a.m.  If Frigerio was released "late" in the day as the Amended

Switzerland.[35]

**B.      United States v. Frigerio Documents**

A review of transcripts and letters relating to the underlying criminal matter is useful in fleshing out the events that transpired between Frigerio's arrest and the eventual filing of the *nolle prosequi* order.  For reasons discussed below, the Court may rely on these documents in considering the Government's motion to dismiss.

**1.      September 24 Letter to the Court**

In advance of the September 28, 2007 hearing, the Government submitted a letter to the Court outlining its opposition to bail.[36]  In that letter, the Government outlined the strength of its evidence:

> The [G]overnment remains in the process of reassembling the evidence from the mid-1980s that underlies the indictment.  We

---

Complaint states, the temperature was at least 54 degrees until 10 p.m.  It is misleading to suggest, as the plaintiff does, that he was released "in the middle of a New York winter." *See* http://weatherspark.com/#!dashboard;a=USA/NY_10007/New_York (relying on the National Oceanic and Atmospheric Administration)*; see also* http://www1.ncdc.noaa.gov/pub/orders/E573D203-7B45-4D71-A236-FA004201E 8B8.pdf (stating that the high temperature in Central Park that day was 58 degrees and the low was 43).

[35]      *See* Am. Compl. ¶ 54.

[36]      *See* 9/24/07 Letter to the Court ("09/27/07 Ltr."), Ex. D to the Clopper Decl.

have, to date, had success in finding many crucial pieces of that evidence. . . . [T]he [G]overnment will disclose that it has located the undercover DEA agent to whom Frigerio sold the cocaine as charged in the [I]ndictment, as well as another supporting witness. We also have paperwork that references several audio recordings made of Frigerio talking about the charged cocaine deal, as well as his own prior experience in the international drug trade.  With respect to the extortion charges, we have located the victim of the extortion, and we also have paperwork relating to audio recordings of Frigerio himself talking about the extortion scheme. We are going through archived files to locate the relevant recordings.[37]

Thus, at the time, the Government maintained that it would recover the audio tapes, and noted that in any event, it possessed other evidence of Frigerio's guilt.

### 2.    September 28 Hearing

A bail hearing was held on September 28, 2007,[38] during which Frigerio's counsel, Peter Ginsberg, sought to undercut the supposed strength of the evidence against his client.[39]  Ginsberg explained that the facts presented to the Grand Jury in the 1980s were likely introduced by a single agent — former DEA agent Robert Stia.[40]  Ginsberg explained that Stia lacked credibility and that "the

---

[37]    *Id.* at 3.

[38]    *See* Transcript of 09/28/07 Hearing ("09/28/07 Tr."), Ex. C to the Clopper Decl.

[39]    *See id.* at 10.

[40]    *See id.*

government, if it's relying on Mr. Stia, has a huge way to go before it could even get to a jury in this case."[41]

Frigerio's counsel also questioned the availability of Raphael Cohen, the extortion victim, and the Court agreed that the Government would ultimately need to disclose to the defense the identity of Cohen's attorney.[42]  The Government explained that Cohen was too fearful to speak to Frigerio's attorneys,[43] but Assistant U.S. Attorney ("AUSA") Elie Honig explained that Cohen had been subpoenaed to testify at trial.[44]

In considering whether to grant bail, the Court discussed the strength of the evidence, stating:

> [T]he [G]overnment has responded to the challenge, so to speak, as to the strength of the evidence, and the [G]overnment says the undercover is available, he had direct transaction with your client, he will testify at trial.  Yes, he might be subject to vigorous cross examination, but so be it, and there was another agent who was a witness to that.  It sounds like they have met their burden with respect to the strength of the evidence.  And they say, in addition to that, they do have the extortion victim under subpoena.[45]

---

[41]    *Id.* at 11.

[42]    *See id.* at 12-13.

[43]    *See id.* at 20-21.

[44]    *See id.* at 21.

[45]    *Id.* at 24.

For that reason, and because Frigerio could not post any collateral on a bond, I denied Frigerio's bail application.[46]

### 4.   October 24 Hearing

Another pretrial hearing was held on October 24, 2007.[47]  Ginsberg began by broaching the subject of the audio and video tapes.

> We have not yet received any of the audio and videotapes . . . which we addressed previously.  I don't know whether the government will be able to find those tapes or not.  It's our view that those tapes are exculpatory.[48]

In response to the Court's inquiry into the status of discovery, Ginsberg explained that

> we have received one laboratory report, a statement that purportedly was taken from Mr. Frigerio on the day of his arrest. . . . I'm not sure we've received anything else.  We've received another copy of the [I]ndictment.  We essentially have received nothing, and the [G]overnment's position is there's nothing to receive except for these audio and videotapes.[49]

AUSA Honig clarified the Government's search for the evidence:

> We produced everything we have that is Rule 16.  As I informed

---

[46]      *See id.*

[47]      *See* Transcript of 10/24/07 Hearing ("10/24/07 Tr."), Ex. G to the Clopper Decl.

[48]      *Id.* at 2-3.

[49]      *Id.* at 3.

> Mr. Ginsberg, we are looking for the tapes. I filled him in specifically where we are in that process. We went to the DEA, it appears the DEA does not have them. It appears the United States Attorney's Office does have them. What we've had to do was order up all the boxes from the Pizza Connection case. It's a lot of boxes. They've been ordered from our storage facility from Kansas or Nebraska, wherever it is, and I believe they are now assembled . . . . They're a day or so away from being assembled.[50]

The Court then inquired whether the boxes would contain the tapes in question.

AUSA Honig responded:

> We hope. We have paperwork, 302's, Grand Jury minutes indicating specific recordings that were made, audio and video. With the notion that there's some sort of *Brady* material in there, I don't quite understand if there's some specific thing that we should be looking for that Mr. Ginsberg wants to tell us about that would be exculpatory to his client.[51]

Shortly thereafter, the Government summarized what the tapes could

reveal about the drug charges against Frigerio:

> [A]ccording to the 302's and the 6's . . . Mr. Frigerio came up with a plan, talked to the undercover agent about I have this drug source, described it in some detail, what type of source it is, are you interested, and the undercover said yes, and then there are both tapes and memos — well I should correct that. There are surveillance reports that Mr. Frigerio was surveilled essentially throughout the day when he made the delivery; meeting with others who he got it from up to the point where he transported it and then walked into the undercover office.

---

[50]     *Id.* at 12.

[51]     *Id.*

-11-

> And, like I said, some of the conversations with Mr. Frigerio in
> which Mr. Frigerio and the undercover discuss this deal are on
> tape, if you can go by what the documents say. . . . But we're not
> – we're not sitting on anything that we have and we're trying to
> hold back.  I just want to make that clear.  And even in the
> absence of these tapes, I think we can still proceed.  We have
> several fact witnesses alive and located and subpoenaed who
> remember this quite well, so that's where we stand.[52]

Ginsberg requested that the Indictment be dismissed because the Government had

"failed to make the rolling production in a timely fashion prior to the November

trial date."[53]  I denied the motion, explaining:

> I think the [G]overnment, at least according to Mr. Honig, has
> been making good-faith efforts since the day Mr. Frigerio was
> arrested.  The boxes have been located, the boxes are being
> delivered.  The story will develop.  We will learn very shortly
> whether there is the ability to locate these tapes or is not, and you
> may have a stronger motion as the days go by, I don't know.  But
> right now would not be the time for me to grant this oral motion,
> so I can't do that.[54]

### 5.    November 6 Letter

Several days before the next scheduled pretrial conference, the

Government submitted a letter stating:

> The Government writes to inform the Court and counsel for the
> defendant that after an extensive search, the Government has been

---

[52]    *Id.* at 22-23.

[53]    *Id.* at 32.

[54]    *Id.*

unable to locate the audio and video tapes referenced in the
Government's September 28, 2007 initial discovery letter sent to
counsel for the defendant.  At trial, the Government intends to
introduce witness testimony concerning the content of those tapes
pursuant to Fed. R. Evid. 1004.[55]

### 6.    November 15 Hearing

Defendant renewed his request to dismiss the Indictment based on the

destruction of evidence.[56]  A hearing was held on November 15, 2007.  Defense

counsel noted that although the Government learned of the destruction of the tapes

on October 1, it did not disclose the information until October 6, 2007.[57]  AUSA

Steve Lee acknowledged that the Government had learned on October 1 that the

DEA's copies of the tapes had been destroyed in 1999.[58]  However, the

Government maintained that:

> [C]opies were also at some point with the F[]B[]I[] and also with
> the United States Attorney's office.  So after we learned that the
> DEA copies had been destroyed, the F[]B[]I[] made efforts to look
> for any copies of these videotapes in F[]B[]I[] files.  And then
> after that, the United States' Attorney's [O]ffice, we couldn't
> locate any files under the name Frigerio or under the docket

---

[55]    *See* 11/06/07 Letter to the Court ("11/06/07 Ltr."), Ex. H to
Defendant's Motion to Dismiss.

[56]    *See* Transcript of 11/15/07 Hearing ("11/15/07 Tr."), Ex. B to the
Clopper Decl., at 4.

[57]    *See id.* at 5.

[58]    *See id.* at 5-6.

> number, so we started to look in a different file recommended by
> agents and former assistants that Ms. Coppola had spoken to. So
> we ordered 200 boxes relating to the Pizza Connection case, the
> Badalamente case, which Mr. Frigerio was loosely a part of. So
> after we learned that the DEA copies had been destroyed, we
> looked for copies where we expected them to be, both with the
> F[]B[]I[], who was jointly investigating the case back in the '80s,
> and also with the United States Attorney's [O]ffice.[59]

The search of FBI records and the boxes maintained by the U.S. Attorney's Office

proved fruitless. The Government attorney acknowledged that by October 25 the

FBI had determined that no videotapes existed.[60]

At the November 15 hearing, Coppola testified about her involvement

with the case and the development of the evidence against Frigerio.[61] Coppola

described her inquiries to the DEA,[62] her conversations with the FBI evidence

technician,[63] her request for additional boxes from the U.S. Attorney's storage

facility,[64] and her calls to former agents and prosecutors.[65] Each of those efforts to

-----

[59]    *Id.* at 6.

[60]    *See id.* at 19 (statement of AUSA Lee).

[61]    *See id.* at 42.

[62]    *See id.* at 47.

[63]    *See id.* at 49.

[64]    *See id.* at 51.

[65]    *See id.* at 50, 54.

find the tapes was unsuccessful.  Coppola also explained that she had seen evidence from 1980s Grand Jury testimony suggesting that tapes had been played.[66]

In summary, by October 30, Coppola knew the DEA originals had been destroyed, that the U.S. Attorney's Office had not located any tapes, and that the FBI had not recovered any relevant recordings.[67]  Still, at that point, there existed an open plea offer with an expiration date of November 2.[68]  And while the Government had conveyed to the defense that it was "confident" the tapes would turn up, Coppola testified that to the best of her knowledge, neither she nor anyone else clarified for the defense the status of the search for the tapes.[69]  Nonetheless, other evidence allegedly existed.[70]  As I noted, although the tapes may have been missing, the Government represented that both Cohen and Stia planned to testify.[71] The existence of those witnesses was never disputed.

## III.   LEGAL STANDARD

---

[66]     *See id.* at 63-64.

[67]     *See id.* at 78-79.

[68]     *See id.* at 79.

[69]     *Id.*

[70]     *See id.* at 86.

[71]     *See id.*

A.     **Motion to Dismiss**

1.     **Failure to State a Claim**

In deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the

"two-pronged approach" dictated by the Supreme Court in *Ashcroft v. Iqbal*.[72]

*First*, a court "'can choose to begin by identifying pleadings that, because they are

no more than conclusions, are not entitled to the assumption of truth.'"[73]

"Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice" to withstand a motion to dismiss.[74]  *Second*,

"[w]hen there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement for

relief."[75]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the

complaint must meet a standard of "plausibility."[76]  A claim is facially plausible

---

[72]     556 U.S. —, 129 S.Ct. 1937, 1950 (2009).

[73]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[74]     *Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[75]     *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[76]     *Twombly*, 550 U.S. at 564.

-16-

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[77] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[78]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[79]  The court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[80]  Further, "courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."[81]  Allegations

---

[77]     *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[78]     *Id.* (quotation marks omitted).

[79]     *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[80]      *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[81]     *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

made within the complaint that are "contradicted by more specific allegations or documentary evidence" are not entitled to a presumption of truthfulness.[82]

### 2.      Subject Matter Jurisdiction

A district court may exercise subject matter jurisdiction if the action "arises under" federal law.[83]  An action "arises under" federal law if "'in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law.'"[84]  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."[85]

When defendants challenge the legal sufficiency of plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as

---

[82]      *L-7 Designs, Inc. v. Old Navy, LLC*, — F.3d. —, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (citing *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) and *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)).

[83]      *See Bracey v. Board of Educ. of City of Bridgeport*, 368 F.3d 108, 113 (2d Cir. 2004) (citing 28 U.S.C. § 1331).

[84]      *Id.* at 114 (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 (1993) (superseded by statute on other grounds)).

[85]      *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

true and draw all reasonable inferences in favor of plaintiff.[86]  However, "where

evidence relevant to the jurisdictional question is before the court, 'the district

court . . . may refer to [that] evidence.'"[87]  Therefore, "[i]n resolving the question

of jurisdiction, the [] court can refer to evidence outside the pleadings and the

plaintiff asserting subject matter jurisdiction has the burden of proving by a

preponderance of the evidence that it exists."[88]  The consideration of materials

extrinsic to the pleadings does not convert the motion into one for summary

judgment.[89]

> **B.     FTCA**

The FTCA provides a limited waiver of the United States's sovereign

immunity, authorizing suits against the government for damages

> for injury or loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any employee of
> the Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with

---

[86]     *See Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (quotation marks and citation omitted).

[87]     *Id.* (alterations in original) (quoting *Makarova*, 201 F.3d at 113).

[88]     *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002).

[89]     *See CCS Int'l Ltd. v. United States*, No. 03 Civ. 0507, 2003 WL 23021951, at *2 (S.D.N.Y. Dec. 24, 2003).

the law of the place where the act or omission occurred.[90]

There are, however, many exceptions.

### 1.    Intentional Tort Exception

One exception, section 2680(h), "commonly known as the intentional tort exception, bars all claims arising in connection with, amongst others, 'false imprisonment, false arrest [and] malicious prosecution.'"[91]   However,

> [t]his exception to the general rule of sovereign immunity does not apply . . . to the 'acts or omissions of investigative or law enforcement officers,' and the federal government thus remains liable for the intentional torts of those officers.  The FTCA defines 'investigative or law enforcement officer' as 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.'[92]

Consequently, "the FTCA does not authorize suits for intentional torts based upon the actions of Government prosecutors,"[93] such as Assistant United States

---

[90]    28 U.S.C. § 1346(b); *see also id.* § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").

[91]    *Davis v. United States*, No. 03 Civ. 1800, 2004 WL 324880, at *6 (S.D.N.Y. Feb. 19, 2004) (quoting 28 U.S.C. § 2680(h)).

[92]    *Id.*

[93]    *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir. 1994).

Attorneys.[94]  In short, "[a] malicious prosecution claim is barred by the FTCA

when 'control of the prosecution pass[es] to the prosecutor.'"[95]

Courts consider control to have passed to the prosecutor when the

attorneys "exercise . . . independent judgment.  At least that is so in the absence of

evidence that the police officer misled or pressured the official who could be

expected to exercise independent judgment."[96]  Specifically, the Second Circuit has

held that control passes when the Grand Jury issues an Indictment.[97]  A case arising

in the District of Connecticut held that once the prosecutors take control of the

case, a court cannot impose liability for malicious prosecution unless "the

defendant (i.e., the FBI agents) [can] be shown to have taken an active part in the

proceedings."[98]  That court cited the Restatement of Torts for the proposition that:

"[T]he defendant must take an active part in [the] prosecution

_____

[94]     *See Bakowski v. Kurimai*, No. 3:98 Civ. 2287, 2000 WL 565230 (D.
Conn. Mar. 20, 2000), *aff'd*, 387 F. App'x. 10 (2d Cir. 2003) (citing *Wright v.
United States*, 719 F.2d 1032, 1034 (9th Cir. 1983)); *see also Dirienzo v. United
States*, 690 F. Supp. 1149, 1158 (D. Conn. 1988).

[95]     *Davis*, 2004 WL 324880, at *6 (quoting *Bernard*, 25 F.3d at 104).

[96]     *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999)
(citations omitted).

[97]     *See Bernard*, 25 F.3d at 104 ("Once the grand jury indicted Bernard,
control of the prosecution passed to the prosecutor and was no longer within the
agent's authority.).

[98]     *Dirienzo*, 690 F. Supp. at 1158.

-21-

> after learning that there is no probable cause for believing the accused guilty. . . . His share in continuing the prosecution must be active, as by insisting upon or urging further prosecution. The fact that he initiated the proceedings does not make him liable [for continuation of the prosecution] merely because he intentionally refrains from informing a public prosecutor, into whose control the prosecution has passed, of subsequently discovered facts that clearly indicate the innocence of the accused, even though they have the effect of convincing him that this is the fact."[99]

Thus, the law enforcement officer must do far more than simply aid in the investigation.

### 2.   Discretionary Function Exception

Another exception, the Discretionary Function Exception ("DFE"), provides that the Government is not liable for

> "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice." . . . The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no

---

[99]   *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 655 cmt. c (1977)).

rightful option but to adhere to the directive."[100]

Not all actions involving judgment, however, invoke the DFE.[101] "[T]he purpose of the exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,'"[102] and as such, "when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'"[103] The DFE cannot shield the Government from liability in cases "involv[ing] negligence unrelated to any plausible policy objectives."[104]

In sum, for the DFE to bar suit, two conditions must be met. *First*, "the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation."[105]

---

[100]   *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting 28 U.S.C. § 2680(a) and *Berkovitz*, 486 U.S. at 536).

[101]   *See Gaubert*, 499 U.S. at 322.

[102]   *Id.* at 323 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)).

[103]   *Id.* (quoting *Berkovitz*, 486 U.S. at 537).

[104]   *Id.* at 111.

[105]   *Coulthurst v. United States,* 214 F.3d 106, 109 (2d Cir. 2000) (citing *Gaubert*, 499 U.S. at 322-23 and *Berkovitz*, 486 U.S. at 536-37).

And *second*, "the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis."[106]

### C.    Malicious Prosecution

"Freedom from malicious prosecution is a constitutional right that has long been clearly established."[107] "To state a claim for malicious prosecution under New York law, the plaintiff must show: (1) 'the defendant initiated a criminal proceeding'; (2) the proceeding terminated in plaintiff's favor; (3) 'there was no probable cause for the criminal charge'; and (4) the defendant acted maliciously."[108]

### D.    False Imprisonment

"This claim is distinct from one of malicious prosecution: 'each protects a different personal interest and is composed of different elements.'"[109]

---

[106]    *Id.*

[107]    *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).

[108]    *Brandon v. City of New York*, 705 F. Supp. 2d 261, 272 (S.D.N.Y. 2010) (quoting *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004)). *Accord Cantalino v. Danner*, 96 N.Y.2d 391, 394-95 (2001); *Guntlow v. Barbera*, 907 N.Y.S.2d 86, 92-93 (3d Dep't 2010), *appeal dismissed*, 907 N.Y.S.2d 86 (2010). For reasons addressed below, it is unnecessary for this Court to delve further into the elements of a malicious prosecution claim.

[109]    *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)).

"The tort of false arrest in New York is the same as false imprisonment."[110]  The

elements of those claims are: "'(1) the defendant intended to confine [the plaintiff],

(2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent

to the confinement and (4) the confinement was not otherwise privileged.'"[111]

"[T]he existence of probable cause is an absolute defense to a false

arrest claim."[112]  "But the New York Court of Appeals has expressly held that the

presumption of probable cause arising from an indictment 'applies only in causes

of action for malicious prosecution and is totally misplaced when applied in false

[arrest] actions.'"[113]  "An officer has probable cause to arrest when he or she has

'knowledge or reasonably trustworthy information of facts and circumstances that

are sufficient to warrant a person of reasonable caution in the belief that the person

to be arrested has committed or is committing a crime.'"[114]  However, "probable

cause can exist even where it is based on mistaken information, so long as the

---

[110]     *Bryant v. Crowe*, 697 F. Supp. 2d 482, 487 (S.D.N.Y. 2010) (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)).

[111]     *Singer*, 63 F.3d at 118 (quoting *Broughton*, 37 N.Y.2d at 456).

[112]     *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

[113]     *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Broughton*, 37 N.Y.2d at 456).

[114]     *Jaegly*, 439 F.3d at 152 (quoting *Weyant*, 101 F.3d at 852).

arresting officer acted reasonably and in good faith in relying on that information."[115]

While it is true that probable cause is a "fluid concept [that] . . . can change during an individual's confinement,"[116] *Jaegly v. Couch* makes clear that a claim of false arrest or imprisonment "turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge. . ."[117]  A plaintiff alleging false imprisonment can, if successful, recover damages accrued from "'the time of detention up until issuance of process or arraignment, but not more.  From that point on, any damages recoverable must be based on a malicious prosecution claim.'"[118]  Thus, the relevant inquiry is into whether probable cause existed *at the time of arrest*.

### E.   Negligence

#### 1.   Negligent Arrest or Prosecution

---

[115]   *Bernard*, 25 F.3d at 102 (citing *Colon v. City of New York*, 60 N.Y.2d 78 (1983)).

[116]   *Bryant*, 697 F. Supp. 2d at 490.

[117]   *Jaegly*, 439 F.3d at 154.

[118]   *Id.* (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 119, at 888 (5th ed. 1984)).

"Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."[119] When a

> plaintiff . . . alleg[es] an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory. A plaintiff may seek recovery only through the traditional tort remedies of false arrest, false imprisonment and malicious prosecution.[120]

### 2.    Elements of Negligence

"In order to establish a prima facie case of negligence under New York law, a claimant must show that: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach."[121]  As to whether a duty is owed, the traditional rule is that

---

[119]    *Bernard*, 25 F.3d at 102 (citing *Dirienzo*, 690 F. Supp. at 1155 and *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 743 (4th Dep't 1979)).  *Accord Hicks v. City of Buffalo*, 124 F. App'x 20, 25 (2d Cir. 2004).

[120]    *Rheingold v. Harrison Town Police Dept.*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) (citing *Bernard*, 25 F.3d at 102). Accord *Davis*, 2004 WL 324880.

[121]    *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) (citing *Solomon v. City of N.Y.*, 66 N.Y.2d 1026, 1027 (1985)).

> [w]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.[122]

More specifically, "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule."[123]

## F.   Intentional Infliction of Emotional Distress

New York law requires that a plaintiff alleging intentional infliction of emotional distress prove four elements:

> (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."[124]

Whether the alleged conduct is sufficiently extreme and outrageous is a matter of

---

[122]   *Havas v. Victory Paper Stock Co., Inc.*, 49 N.Y.2d 381, 386 (1980) (citation and internal quotation marks omitted).

[123]   *United States v. Muniz*, 374 U.S. 150, 164-65 (1963).

[124]   *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).

-28-

law for the courts to decide.[125]   The extreme and outrageous requirement provides

for liability only where the conduct has been "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society."[126]   This

standard is "rigorous and difficult to satisfy."[127]   As such, "[a] lawful arrest cannot

support a claim for intentional or negligent infliction of emotional distress."[128]

Further, an IIED claim arising out of an act that would otherwise be

barred by the intentional torts exception is similarly prohibited.   "In determining

the applicability of the [section] 2680(h) exception, a court must look, not to the

theory upon which the plaintiff elects to proceed, but rather to the substance of the

claim which he asserts."[129]   Thus, a court must examine the basis for the IIED

---

[125]   *See Koulkina v. City of N.Y.*, 559 F. Supp. 2d 300, 324 (S.D.N.Y. 2008) (citing *Howell*, 81 N.Y.2d at 121).

[126]   *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) (quotation marks and citations omitted).

[127]   *Ifill v. United Parcel Serv.*, No. 04 Civ 5963, 2005 WL 736151, at *8 (S.D.N.Y. Mar. 29, 2005) (quotation marks and citations omitted) (holding that employee's allegations that employer harassed, discriminated, demoted, and retaliated against her were insufficient to state an IIED claim).

[128]   *Csoka v. County of Suffolk*, 85 F. Supp. 2d 117, 123 (E.D.N.Y. 2000). *Accord Carey v. City of Mt. Vernon*, No. 09 Civ 3191, 2010 WL 3912400 (S.D.N.Y. Sept. 13, 2010).

[129]   *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir. 1976). Accord *Lazo v. United States*, No. 06 Civ 5438, 2007 WL 2948342, at *5

claim, and if it duplicates another act listed within section 2680(h), the claim is

barred.[130]

## G.    Negligent Infliction of Emotional Distress

Three lines of NIED cases exist under New York law.[131]  *First*, NIED

may be found where the defendant owes a direct duty of care to the plaintiff, the

breach of which causes unreasonable risk of physical harm to the plaintiff.[132]

*Second*, NIED may be found where plaintiff witnesses injury to an immediate

family member while in the zone of danger created by defendant.[133]  *Third*, NIED

---------

(S.D.N.Y. Oct. 9, 2007).

[130]    *See Lazo*, 2007 WL 2948342; *Truman v. United States*, 26 F.3d 592,
595 (5th Cir. 1994) ("If the conduct on which [plaintiff] bases [his or her] claim for
intentional infliction of emotional distress constitutes a claim 'arising out of' what
is traditionally taken to be a tort enumerated in section 2680(h), then [plaintiff's]
claim is barred."); *Griebsch v. Weaver*, No. 7:05 Civ. 0958, 2005 WL 2260374, at
*5 (N.D.N.Y. Sept. 16, 2005) ("[B]ecause [p]laintiff's claims for the intentional
infliction of emotional distress arise out of the alleged [intentional tort], the
intentional infliction of emotional distress claim also is barred.").  At least one
court has dismissed an IIED claim for the related reason that, "where . . . the
alleged tortious conduct falls entirely within the ambit of traditional tort liability —
where the plaintiff alleges no facts whatsoever beyond those necessary to sustain
claims of [other intentional torts] — we believe New York state courts would not
entertain a separate claim for IIED."  *Li v. Aponte*, No. 05 Civ. 6237, 2008 WL
4308127, at *8 (S.D.N.Y. Sept. 16, 2008).

[131]    *See Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504 (1983).

[132]    *See, e.g., Battalla v. State*, 10 N.Y.2d 237 (1961).

[133]    *See, e.g., Bovsun v. Sanperi*, 61 N.Y.2d 219 (1984).

may be found under special circumstances, usually involving false death reports of family members.[134]

It has long been established that an individual who sustains physical injuries as a result of a tortfeasor's negligence may recover for pain and suffering — physical or mental — that is the natural and proximate result of the physical injuries.[135]  A cause of action for NIED "has its roots in the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not."[136]  As a narrow, interstitial cause of action, NIED allows for recovery for emotional harm in the *absence* of a contemporaneous physical injury.[137]

### H.   Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that other than amendments as a matter of course, "a party may amend its pleading only

---

[134]     *See, e.g., Johnson v. State*, 37 N.Y.2d 378 (1975).

[135]     *See McDougald v. Garber*, 73 N.Y.2d 246, 251 (1989).

[136]     *Abbatielo v. Monsanto Co.*, 522 F. Supp. 2d 524, 534 (S.D.N.Y. 2007) (citing *Lee v. McCue*, 410 F. Supp. 2d 221, 226-27 (S.D.N.Y. 2006)).

[137]     *See In re Air Crash Disaster at Cove Neck, Long Island, N.Y. on Jan. 25, 1990*, 885 F. Supp. 434, 438 (E.D.N.Y. 1995).

with the opposing party's written consent or with the court's leave."[138]  Although

"[t]he Court should freely give leave when justice so requires,"[139] it is "within the

sound discretion of the district court to grant or deny leave to amend."[140]  "When

 a motion to dismiss is granted, the usual practice is to grant leave to amend the

complaint."[141]  However, "it is well established that leave to amend a complaint

need not be granted when amendment would be futile."[142]

## IV.    DISCUSSION

### A.    Malicious Prosecution

Frigerio alleges malicious prosecution with respect to the actions of

Coppola and Reese.  Frigerio's Amended Complaint includes two separate counts

of malicious prosecution, stated in the alternative: one count covering the period of

his September 3, 2007 arrest through his November 21 release; the other count

covering the period from October 1, when the government realized the original

tapes had been destroyed, until his release.

---

[138]    *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks omitted).

[139]    Fed. R. Civ. P. 15(a)(2).

[140]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[141]    *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

[142]    *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

Because control of Frigerio's prosecution passed upon Indictment to the AUSAs, who cannot be held liable for malicious prosecution under the FTCA, I must determine whether the FBI agents exerted enough control over the prosecution to be held liable.  If they did not, neither malicious prosecution claim can proceed.  The Amended Complaint avers that on October 26, 2007, Coppola met with Frigerio and his lawyers, asserted that he would be convicted based upon evidence on the tapes, and urged him to accept a plea agreement.[143]  Frigerio alleges that at the time Coppola made these representations, she knew that the tapes had been destroyed.[144]  These facts, even assuming them to be true, do not show that Coppola exerted the type of control over the prosecution necessary for this claim to proceed.  Nor has Frigerio made any factual allegations suggesting that Reese exerted control over the prosecution.  Frigerio has pled no facts that would support an inference that Coppola or Reese insisted upon or urged continued prosecution.  Without facts demonstrating that the agents exerted such control over the prosecution that the prosecutor ceased to exert his independent judgment, the claim of malicious prosecution cannot proceed.  Frigerio has therefore failed to state a claim against the agents.  Because a malicious prosecution claim against

---

[143]     *See* Am. Compl. ¶ 33.

[144]     *See id.* ¶ 42.

federal prosecutors is barred under the FTCA, this court lacks subject-matter jurisdiction to hear any such claim against the AUSAs.  Accordingly, both malicious prosecution claims are dismissed.

### B.    False Imprisonment

Frigerio states two alternative claims of false imprisonment — one for the period from the date of his arrest through his ultimate release, and the other for the period from October 1, 2007 until his release.  Upon arraignment or issuance of process, however, malicious prosecution is a defendant's only potential claim. Thus, the first claim could only survive for the period from arrest to arraignment, while the second claim, which covers a period beginning after arraignment, must be dismissed.  For that first false imprisonment claim, the relevant inquiry is whether the agents had probable cause to arrest Frigerio.  If they did, the claim is defeated.

In arresting Frigerio, Coppola and Reese acted pursuant to a lawfully obtained warrant.  Further, even without the tapes, the Government had other evidence sufficient to constitute probable cause.  The Government had access to both Agent Stia, the DEA undercover, and Raphael Cohen, the alleged extortion victim, and still held the cocaine Frigerio allegedly sold.[145]  Indeed, based on this

---

[145]    These facts are also asserted in whole or in part in the 09/24/07 Ltr., 10/24/07 Tr., the 11/06/07 Ltr., and the 11/15/07 Tr.

summary of the evidence, I denied defendant's request for bail.  In light of the

warrant, the sealed Indictment, the potential witnesses, and the physical evidence,

the agents clearly had probable cause to arrest Frigerio.  The false imprisonment

claim is therefore dismissed.[146]

### C.    Negligence

#### 1.    Negligent Arrest and Prosecution

A plaintiff may not recover in negligence for a law enforcement

officer's arrest or prosecution.  Frigerio "may seek recovery only through the

traditional tort remedies of false arrest, false imprisonment and malicious

prosecution."[147]  Consequently, this claim is dismissed.

#### 2.    Negligent Release from Prison

Frigerio alleges that Coppola, Reese, and the BOP breached a duty of

care when they released him without proper clothing or funds.  However, Frigerio

misidentifies the responsible parties.  The Government has submitted the

---

[146]    Frigerio has pled no facts from which I can infer that at the time of arrest, Coppola knew that the tapes did not exist.  Such an assertion runs counter to what was asserted repeatedly during the criminal case and what was, at that time, bolstered by documentary evidence.  There is no basis to conclude that the Government made an intentional misstatement with regard to the existence of the tapes.

[147]    *Rheingold*, 568 F. Supp. 2d at 395 n.3 (citing *Bernard*, 25 F.3d at 102).

declaration of a BOP attorney, stating that on November 21, 2007, Frigerio was released by the BOP from the MDC into the custody of the U.S. Marshals Service for his court appearance.[148]   According to those records, he never returned to the prison.[149]   Frigerio has not provided any evidence suggesting otherwise.  Because he was released into the Marshal's custody, Coppola, Reese, and the BOP are not the parties responsible for the manner in which Frigerio was released.  Thus the claim against them is dismissed.

### E.   Intentional Infliction of Emotional Distress

Frigerio alleges two counts of IIED, one stemming from his arrest, detention and prosecution, and the other arising out of the conditions of his release. Taking Frigerio's first claim in stages, the arrest portion of the claim is dismissed because a lawful arrest cannot form the basis for an IIED claim and I have found that Frigerio's arrest was based on probable cause.  Next, the detention and prosecution part of the claim arises out of the malicious prosecution claim.  That is, the IIED allegation mirrors the malicious prosecution allegation in that it is based upon the same facts and no others. As such, because control of the prosecution passed to the AUSAs, the IIED claim, like the malicious prosecution claim, is

---

[148]    Declaration of Crista Colvin, Staff Attorney, Metropolitan Detention Center [Docket No. 15].

[149]    *Id.*

barred by the FTCA's intentional tort exception and must be dismissed.

The second IIED claim is also dismissed for the simple reason that release into 50-degree weather, no matter how inconvenient or unprofessional, is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[150]  Moreover, the plaintiff has again failed to identify the proper defendants.

### F.    Negligent Infliction of Emotional Distress

Frigerio alleges three different counts of NIED.  The first is based upon the fact that he was subject to frightening conditions while in prison.  The thrust of the case law suggests that a prison's decision as to where to assign an inmate and how to ensure his well-being involves elements of choice and is grounded in public policy considerations.  In addition, Frigerio has not pointed to the violation of any specific regulation.[151]  Therefore the DFE bars this Court from hearing this claim, which is accordingly dismissed.

The second count of NIED arises out of the Government's continued prosecution and failure to release Frigerio from prison.  But recovery in negligence

---

[150]    *Martin*, 762 F.2d at 220 (quotation marks and citations omitted).

[151]    Frigerio has also failed to support his allegations of emotional distress with any factual content.

on these grounds is prohibited.  "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."[152]  Because NIED relies on a finding of negligence, this claim is not cognizable and is dismissed.

Finally, the third count relates again to the conditions of his release. This claim, in addition to being duplicative of Frigerio's negligence claim, again identifies the wrong parties.  Consequently, it is dismissed.

### G.    Leave to Amend

Because many of Frigerio's claims have been dismissed on legal grounds (rather than because of insufficiency of pleading), it would be futile to replead those claims.  However, Frigerio may file an Amended Complaint with regard to his malicious prosecution claim, if he has a sound basis to allege that the agents pressured the U.S. Attorneys to continue the prosecution.  There is no basis to replead the IIED claim as it is duplicative of the malicious prosecution claim. He may also replead the negligence claim arising out of his release from prison by identifying the proper parties, but not his NIED claim, as it is duplicative of the negligence claim.  Any such complaint must be filed within thirty (30) days of the

---

[152]    *Bernard*, 25 F.3d at 102 (citing *Dirienzo*, 690 F. Supp. at 1155; *Boose*, 421 N.Y.S.2d at 743).

date of this Order.

## V.    CONCLUSION

For the foregoing reasons, the Government's motion to dismiss is granted.  The Clerk of the Court is directed to close this motion [Docket No. 12]. If Frigerio does not file an Amended Complaint within thirty days, the case will be closed.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 11, 2011

**- Appearances -**

**For Plaintiff:**

Peter R. Ginsberg, Esq.
Christina N. Burgos, Esq.
Ginsberg & Burgos P.L.L.C.
12 E. 49th Street, 30th Floor
New York, NY 10017
(646) 374-0028

**For Defendant:**

John D. Clopper
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of New York
86 Chambers Street
New York, NY 10007
(212) 637 2716